NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-133                                        Appeals Court

DORIS RUDNICK  vs.  LEONARD W. RUDNICK.

No. 22-P-133.

Norfolk.     October 13, 2022. – March 30, 2023.

Present:  Sullivan, Neyman, & Brennan, JJ.


Husband and Wife, Antenuptial agreement.  Contract, Antenuptial
    agreement, Marital agreement.  Divorce and Separation,
    Amendment of judgment.


Complaint for divorce filed in the Norfolk Division of the
Probate and Family Court Department on July 12, 2019.

Entry of partial judgment was ordered by George F. Phelan,
J., and the remaining issues were heard by Jacqueline M.
Burchill, J.


Michael G. Xavier (Katie M. Walsh & Peter A. Kuperstein
also present) for the husband.
David E. Cherny (Joana L. Stathi also present) for the
wife.


BRENNAN, J.  Following a bifurcated trial, a judge of the

Probate and Family Court found that the antenuptial agreement

(agreement) executed by Doris Rudnick (wife) and Leonard W.

Rudnick (husband) was fair and reasonable when it was signed,

but unconscionable and therefore unenforceable at the time of divorce.  Partial judgment entered accordingly on May 12, 2020.[1]  After a second trial, a different judge entered an amended judgment of divorce nisi on December 17, 2021, that, among other things, divided the marital estate.  The husband appeals from the partial judgment that invalidated the agreement.[2]  Concluding that the judge did not err in determining that the agreement was unconscionable at the time of enforcement, we affirm.

1.  Background.  We summarize the facts as found by the trial judge.  The parties married on November 28, 1992.  This was a second marriage for both parties.  Each had children from prior marriages, but no children were born of this marriage.  When their relationship began, the wife, who was fifty-eight years old, worked as an administrative assistant at a Boston hospital.  The husband, who was sixty-five years old, had been a successful self-employed businessman.  The husband retired

---

[1] The judgment was dated April 27, 2020.

[2] Although the husband's notice of appeal included the amended judgment of divorce nisi, on appeal, he makes no separate argument as to the division of assets or other aspects of the amended judgment of divorce nisi.  Because the husband did not brief these issues, they are waived.  See Kilnapp Enters., Inc. v. Massachusetts State Auto. Dealers Ass'n, 89 Mass. App. Ct. 212, 222 n.4 (2016), quoting Smith v. Bell Atl., 63 Mass. App. Ct. 702, 725 n.8 (2005)("An argument that is not raised in a party's principal brief may be deemed waived").

before the marriage and the wife retired the year after the marriage.

The day before their marriage, at the husband's request, the parties signed the agreement. The husband claimed that he would not have married the wife without the agreement in place. The agreement was drafted by the husband's attorney. The wife's attorney -- with whom she only had one contact -- recommended that she not sign the agreement; there were no further discussions between the wife and her attorney about Massachusetts law or the division of assets. Nevertheless, the judge found that both parties signed the agreement freely and voluntarily. The agreement contained, among other things, provisions for the treatment of individual property, ownership of property in which the parties would reside during the marriage, and provided that there would be no claim for alimony, separate maintenance or support, or a division or assignment of income or assets.[3] A statement of each party's assets was attached to the agreement and incorporated therein.

---

[3] The agreement provided in pertinent part that "the parties expect to reside together in a location, style, and manner mutually suitable to them," and "[o]wnership of any homes, residences, or other real property acquired by [husband and wife] shall be held by the parties as Tenants in Common with no rights of survivorship." If the wife survived the husband and they were still married and living together at his death, the wife was to be granted the right to remain living "in a jointly acquired marital residence for life to the extent of any interest in the residence owned by (husband) at the time of his

During the marriage, the parties acquired homes in Canton, Massachusetts, and Lake Worth, Florida. The couple split their time relatively equally between the two properties. Although the wife was involved in the purchase of the Florida property, she did not contribute any of her individual funds and, without her knowledge, the title was in the husband's sole name. Again without the wife's knowledge, the title to the Canton property was held in a trust for the benefit of the husband's adult children. The husband alleged that his adult children provided the funds to purchase the property. Throughout the marriage, the husband paid "rent" to the trust in amounts ranging from $1,800 to $5,000 per month.

The parties met with an architect to design the Canton home and traveled out of State to select furnishings together, including kitchen countertops, cabinets, appliances, and window treatments. The wife contributed approximately $20,000 of her premarital funds towards these purchases. Unfortunately, the

---

death." The right would terminate if the wife remarried, cohabitated with another person other than a blood relative, discontinued her occupation as a primary residence, or died. In the event one of those disqualifying events occurred, or if the wife predeceased the husband, any such jointly acquired marital residence was to be liquidated and the proceeds distributed to the parties pro rata based on their respective contributions to the purchase price and construction costs of the residence. The agreement defined "jointly acquired marital residence" as "the home purchased, constructed, or otherwise contracted for together by the parties subsequent to their marriage, including property acquired as Tenants in Common" (emphasis added).

Canton home was destroyed by a fire in 2007. The wife was involved in decisions regarding rebuilding the home. She believed the Canton property was owned jointly but learned otherwise when the parties separated in 2017. The property was sold in 2018 for $1.28 million and the proceeds of the sale were paid to the husband's adult son.

On July 12, 2019, the wife filed a complaint for divorce wherein she sought, among other things, an equitable division of the marital estate pursuant to G. L. c. 208, § 34. The husband filed a counterclaim for divorce seeking, among other things, enforcement of the agreement. A judge of the Probate and Family Court allowed the husband's motion to bifurcate the case to determine first the validity and enforceability of the agreement. Following a one-day trial, the judge issued a partial judgment finding that the agreement was fair and reasonable at the time of execution, but that it was unconscionable at the time of the divorce[4] because of "material and substantial events" that "essentially stripped [the wife] of substantially all her marital interests." The judge ultimately concluded that the agreement was invalid and unenforceable.

---

[4] The judge determined that the agreement was fair and reasonable at the first-look stage, despite finding that the husband failed to make a full financial disclosure at the time of execution of the agreement. The wife does not argue on appeal that the judge erred in this regard, and thus we do not reach the issue.

After the second trial, a different judge issued an amended judgment of divorce nisi that, as relevant here, divided the marital estate between the parties.  This appeal followed.

2.  Discussion.  a.  Antenuptial agreement.  For an antenuptial agreement to be enforceable, it must be both (1) fair and reasonable at the time of execution (the "first look"), and (2) conscionable at the time of enforcement (the "second look").  DeMatteo v. DeMatteo, 436 Mass. 18, 35-38 (2002). Here, the husband challenges the judge's determination that the agreement was unconscionable at the second-look stage.

Contract principles apply to antenuptial agreements, and the interpretation of an antenuptial agreement is a question of law, which we review de novo.  See DeMatteo, 436 Mass. at 26 n.16; Matter of the Estate of Stacy, 96 Mass. App. Ct. 447, 448, 453 (2019); Greenspun v. Boghossian, 95 Mass. App. Ct. 335, 341 (2019).  The Probate and Family Court judge's findings of fact are reviewed for clear error.  See Adams v. Adams, 459 Mass. 361, 380 (2011), S.C., 466 Mass. 1015 (2013).  In interpreting an antenuptial agreement, we consider it as a whole.  See Tompkins v. Tompkins, 65 Mass. App. Ct. 487, 494 (2006).

In DeMatteo, 436 Mass. at 36-37, the Supreme Judicial Court described the second look as follows:

"In Massachusetts, a valid antenuptial agreement is not unenforceable at the time of divorce merely because its enforcement results in property division or an award of

support that a judge might not order under G. L. c. 208, § 34, or because it is one sided. . . . Rather, we follow the majority of courts and require that a judge may not relieve the parties from the provisions of a valid agreement unless, due to circumstances occurring during the course of the marriage, enforcement of the agreement would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support' herself. . . . The 'second look' at an agreement is to ensure that the agreement has the same vitality at the time of the divorce that the parties intended at the time of its execution. . . . [W]e will not recognize the validity of an antenuptial agreement that essentially strips the contesting spouse of substantially all of her marital interests. For the same reason -- that marriage is a special status from which certain obligations arise -- we will not enforce an antenuptial agreement that prevents a spouse from retaining her marital rights, of which maintenance and support, however disproportionately small, are the most critical" (citation omitted; emphasis added).

Here, the judge on the second look found that the agreement was unconscionable, and thus unenforceable, because it stripped the wife of all marital interests and left her with insufficient financial resources to support herself. Specifically, the judge found that the husband twice had breached the agreement by failing to take title to the Canton and Florida properties as a tenant in common with the wife. He further found that the husband either acquiesced to, or actually engineered, the purchase of the Canton property by the trust in order to "circumvent" the agreement, and that taking title to the Florida property in his individual name was a "naked breach" of the agreement. We are not persuaded by the husband's contention that these findings are clearly erroneous. It is apparent, upon

reading the agreement as a whole, that the parties intended to live together in a "jointly acquired marital residence" in which the wife would have a property interest. As a result of the husband's actions during the marriage, however, the wife was left with no marital property interests,[5] and no right to seek alimony.

The conscionability requirement of the second-look analysis is tied in large measure to the contesting spouse's ability to retain at least some marital interests, whether those interests comprise some marital property, a right to seek alimony, or a combination of both (notwithstanding that those retained interests might be less than what a judge would award pursuant to G. L. c. 208). See DeMatteo, 436 Mass. at 36-37. DeMatteo makes it clear that an agreement that strips a spouse of substantially all marital interests is contrary to public policy

---

[5] We are unpersuaded by the husband's contention that, even if the Canton property was held by the parties as tenants in common consistent with the intent of the agreement, the wife would not have been entitled to any equity therein because she did not contribute toward the purchase price and construction costs. The judge found that the husband engaged in conduct to prevent the wife from acquiring equity in their marital homes; accordingly, the husband cannot avail himself of the very circumstances that he arranged in violation of the spirit of the parties' agreement. Moreover, the record reflects that the wife was involved in the construction and furnishing of the Canton property (contributing approximately $20,000 of her own funds), thus, she likely would have been entitled to some equity had the husband not orchestrated the rental, rather than the outright purchase, of the Canton property.

and is thus unenforceable.[6] Id. In DeMatteo, the antenuptial agreement -- which provided the wife with the marital home free of encumbrance, alimony with cost of living increases and medical insurance until her death or remarriage, a car, and one-half of all property jointly acquired during the marriage -- was not held to be unconscionable because there was no evidence "that circumstances during the marriage led to any changes of any significance: the wife suffered no debilitating illness and she [was] not unable to work should she [have chosen] to supplement her income." Id. at 38. In Austin v. Austin, 445 Mass. 601, 606 (2005), an antenuptial agreement that allowed the wife to retain her premarital property, "permitted [her] a joint interest in marital assets and provided that 'any appreciation on the marital home' . . . be divided as a marital asset, even if the husband held sole title to the property" was not deemed unconscionable. Notably, that agreement "entitled the wife to relocation and 'support' from the husband if there were no

---

[6] This is true both at the first-look stage when reviewing the language of the agreement, and at the second-look stage, when considering events occurring during the marriage that render enforcement of the agreement unconscionable at the time of the divorce. See DeMatteo, 436 Mass. at 31, 37. While we acknowledge that the language of the agreement here left the wife vulnerable to the very misconduct by the husband that resulted in her being stripped of substantially all marital interests, the question of the agreement's validity at the first-look stage was not raised in this appeal, so we do not address it.

jointly owned marital home at the time of a divorce . . . . In short, the agreement provided for either funds from a capital asset or access to support" in the event of a divorce. Id. The court reasoned that, "[g]iven the assets [the wife had] been awarded" under the agreement -- namely, the marital home worth $1.275 million, tangible personal property worth $74,000, and $525,000 in cash -- "we cannot say that the agreement [left] the wife without sufficient property and maintenance." Id. at 608. Finally, we upheld a Probate and Family Court judge's conclusion that an agreement was unconscionable where, although the wife was not stripped of all marital interests, the only marital asset she was awarded had negative value and needed costly repairs. Kelcourse v. Kelcourse, 87 Mass. App. Ct. 33, 35-36 (2015).

Here, enforcement of the agreement would leave the wife with no marital assets and no alimony, in direct contravention of DeMatteo. She was eighty-six years old at the time of trial, ailing, and unable to earn income. Notably, the wife waived her right to alimony with the understanding that she would be entitled to the appreciation of the value of any real property acquired during the marriage -- here the Canton and Florida homes. However, the manner in which the husband took title to those properties placed them out of the wife's reach and thus prevented her from "retaining her marital rights." DeMatteo,

436 Mass. at 37. The record amply supports the judge's findings that, as a result of the husband's actions to "circumvent" the agreement, the wife (1) would get "nothing after 27 years of marriage" and would be "essentially stripped of substantially all her marital interests," and (2) was in a worse situation due to her "age and health circumstances," "had to tap her assets to support herself in a modest lifestyle," and "now does not have sufficient property, maintenance or suitable employment for self-support." If the agreement were enforced, the wife would be in the same position as if she had never been married at all, in direct contravention to the intent of the parties that the wife retain at least some marital property interests, as set forth in their agreement. See id. (agreement should have same vitality when executed and at time of divorce). Simply put, enforcement of the agreement would deprive the wife of her marital interests. See id. (recognizing special status of marriage gives rise to obligations and antenuptial agreements that cause a spouse to retain no marital interest are invalid).

The partial judgment dated April 27, 2020, and the amended judgment of divorce dated December 17, 2021, are affirmed.[7]

So ordered.

---

[7] The husband's and the wife's requests for appellate attorney's fees are denied.